IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

SEP 2 8 2001

~~NANCY MAYER WHITTINGTON, CLERK~~
~~U.S. DISTRICT COURT~~

SECURITIES AND EXCHANGE COMMISSION, :
500 W. Madison St, Suite 1400
Chicago, Ill. 60661
      Plaintiff,

    v.

TRANS ENERGY, INC.,
LOREN E. BAGLEY, and
WILLIAM F. WOODBURN.

      Defendants.

CIVIL ACTION

CASE NUMBER  1:01CV02060

JUDGE:  Emmet G. Sullivan

DECK TYPE:  General Civil

DATE STAMP:  09/28/2001

*ECF*

## COMPLAINT

Now comes the Plaintiff, United States Securities and Exchange Commission

("Commission"), and alleges as follows:

### NATURE OF THE COMPLAINT

1.     This case concerns Trans Energy, Inc.'s dissemination of numerous false and

misleading statements to the investing public through press releases, website postings, and

Commission filings.  In October 2000 press releases, Trans Energy grossly overstated the value of

its potential oil reserves in Wyoming and misrepresented its costs to drill those reserves.  In a

November 2000 posting on its website, Trans Energy inaccurately minimized the significance of

the "going concern" opinion issued by Trans Energy's auditors.  In December 2000, Trans Energy

issued a press release that falsely described the Chapter 7 involuntary bankruptcy filed against it,

while leaving out significant negative information about the proceeding.  Finally, in Commission

filings from 1998 through 2000, Trans Energy misrepresented the status of, or failed to disclose

the existence of, material lawsuits pending against the company that resulted in over $1 million in

consent judgments.  Each fraud and reporting violation discussed in this complaint occurred at the

1

direction of Trans Energy's president, Loren E. Bagley, and its vice president and principal financial officer, William F. Woodburn, who together controlled Trans Energy's operations.

2.    Trans Energy, Bagley, and Woodburn's conduct violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Further, Trans Energy's conduct violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, as aided and abetted by Bagley and Woodburn within the meaning of Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)]. There is a reasonable likelihood that Trans Energy, Bagley, and Woodburn, unless enjoined, would continue to engage in transactions, acts, practices and courses of business the same as or similar to those set for the above.

### JURISDICTION

3.    This Court has jurisdiction of this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa] and 28 U.S.C. § 1331.

4.    Defendants Trans Energy, Bagley, and Woodburn, directly or indirectly, have made use of the mails and means or instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in the complaint.

### THE DEFENDANTS

5.    Trans Energy is a small oil and natural gas exploration and distribution company with operations in West Virginia and Wyoming. Trans Energy is a Nevada corporation formed in 1993 and headquartered in St. Mary's, West Virginia. Trans Energy's stock is quoted on the OTC Bulletin Board, a quotation service operated by the National Association of Securities Dealers ("NASD"), under the symbol TSRG.

6.      Loren E. Bagley is 59 years old and is a resident of Middlebourne, West Virginia. Bagley was Trans Energy's president and chief executive officer at the time of the conduct alleged in this complaint.

7.      William F. Woodburn is 59 years old and is a resident of Belpre, Ohio. Woodburn was Trans Energy's vice president and principal financial officer at the time of the conduct alleged in this complaint.

## THE FACTS

**A.      Trans Energy Misrepresented the Value of Its Wyoming Oil Reserves and its Costs to Drill the Acreage**

8.      In mid-October 2000, Trans Energy issued five press releases about its supposed $612 million oil and gas asset in the Powder River Basin in Wyoming ("$612 million press releases").[1] The five $612 million press releases were nearly identical in their discussion of Trans Energy's Powder River Basin acreage. For example, the October 17th press release said in relevant part:

> "In 1998, Trans Energy purchased 20,000 acres of oil and natural gas leases in Wyoming's highly productive Powder River Basin (Business Wire, Oct. 11, 2000). There have been 15 prospects identified on this acreage, with potential reserves estimated at 17 million barrels of oil. At around $36 per barrel, this represents a significant potential asset of approximately $612 million."

9.      Bagley and Woodburn drafted the above-quoted language and they were solely responsible for directing the dissemination of Trans Energy's press releases to the investing public. Trans Energy disseminated the five press releases at issue in this case through Business Wire or PR Newswire, services that distribute company news to the investing public. On October 17, 2000, Trans Energy's stock price closed at its six-month high of $0.289.

---

[1]  The five press release dates were October 13, 16, 17, 18, and 19, 2001.

10.   In 1998, Trans Energy purchased the Powder River Basin leases referenced in the $612 million press releases (together with a 3-D seismic analysis of the potential oil reserves on that leasehold acreage and three producing oil wells) for approximately $3.2 million.

11.   The $612 million press releases failed to disclose that Trans Energy did not use an industry-accepted formula to value its oil reserves, or that the resulting $612 million figure is many times higher than the value of the reserves according to industry-accepted methods. Trans Energy's Powder River Basin reserves referenced in the $612 million press releases are "unproved" reserves, meaning that Trans Energy has not drilled the test wells necessary to project oil production estimates for the acreage. The industry-accepted methods for valuing unproved oil reserves are based on cost or fair market value. Trans Energy had not undertaken a fair market value analysis of its Powder River Basin interests as of October 2000. Under a cost-based analysis, Trans Energy could legitimately value its Powder River Basin interests at no more than the $3.2 million purchase price.

12.   Bagley and Woodburn knew, or were reckless in not knowing, that there was no reasonable basis to value Trans Energy's Powder River Basin acreage at $612 million. Bagley and Woodburn have no experience or training in economically valuing oil reserves. Further, they negotiated Trans Energy's $3.2 million purchase of the Powder River Basin interests in 1998 and they knew that Trans Energy had not done anything to enhance the value of the unproved reserves, including drilling test wells. Accordingly, Bagley and Woodburn knew, or were reckless in not knowing, that the $612 million press releases grossly overstated the value of Trans Energy's Powder River Basin acreage.

13.   Moreover, in the $612 million press releases issued on October 17, 18, and 19, 2000, Trans Energy misrepresented its costs to drill for oil in the Powder River Basin property as

4

"well below the industry average." Trans Energy's costs to drill an oil well are the same as a major oil company's costs. Bagley and Woodburn, as the two principal officers of Trans Energy, knew Trans Energy's drilling costs. Based on their experiences and knowledge of industry-average drilling costs, Bagley and Woodburn knew, or were reckless in not knowing, that Trans Energy's costs were not "well below the industry average."

**B.     Trans Energy Inaccurately Minimized The Significance of its Auditors' "Going Concern" Opinion**

14.     Trans Energy's auditors issued a "going concern" opinion in connection with Trans Energy's financial statements for its fiscal year-ended December 31, 1999. A going concern opinion is intended to convey the auditors' substantial doubt that a company can continue to function as a business.

15.     Trans Energy included the auditors' going concern opinion in its Form 10-KSB filed with the Commission for 1999. In its Forms 10-QSB filed with the Commission for the first three quarters of 2000, Trans Energy referenced the auditors' going concern opinion.

16.     On November 17, 2000, Trans Energy posted a "letter to shareholders" on its website, www.transenergy.net, in response to investor calls about Trans Energy's most recent Commission filing, as posted on the Yahoo! Finance website. Bagley and Woodburn wrote this letter and had it posted on Trans Energy's website without consulting Trans Energy's auditors. This letter stated, in part:

> "Regarding the 'Going Concern Statement,' that item has normally been in all of our recent SEC filings. It is a cautionary statement which protects the auditors and the Company. It is required until the Company posts a recorded profit. This is normal and customary for such filings.
>
> However, the document prepared by FreeEdgar and released by Yahoo Finance left out a substantial portion of a key paragraph. The last sentence of the deleted paragraph read: 'Management is committed to meeting the operational cash flow needs of the company.' Taken in the appropriate and entire context, that sentence

5

changes the total meaning of what was released.  Interested parties should review the total content of our 10QSB filing and not rely upon edited versions."

17.     This letter inaccurately minimized the significance of the auditors' going concern opinion.  Contrary to Trans Energy's claim, a going concern statement is not "normal and customary" for filings where a company has not yet posted a profit.  Moreover, Trans Energy's claim that management's commitment to meeting the company's cash flow needs "changes the total meaning" of the going concern statement further distorts the significance of the auditors' going concern opinion.

18.     Bagley and Woodburn knew, or were reckless in not knowing, that the website posting about the going concern opinion was false and misleading.  Neither Bagley nor Woodburn has any accounting background, yet they did not consult Trans Energy's auditors about the statement.  Further, Bagley and Woodburn posted this letter knowing that on October 16, 2000, Trans Energy had been placed in Chapter 7 involuntary bankruptcy because of its inability to pay one of its most significant liabilities.

**C.      Trans Energy Made False and Misleading Statements About its Chapter 7 Bankruptcy**

19.     On December 27, 2000, Trans Energy issued a press release ("December 27th press release") that said:

> "The bankruptcy proceeding filed in Houston against Trans Energy by a single creditor translates essentially to a breakdown in communications. An 8-K has not been filed, as Trans Energy has only been formally notified of the filing of the Petition within the last 24 hours. The Company has been in settlement negotiations in this matter, and the filing comes as a surprise, based upon a settlement having been reached. A Motion to Dismiss will be filed immediately, and the Company's counsel has requested an expedited hearing. We fully expect the matter to be resolved, and expect that this will have no continued adverse affect [sic] on the company."

20.     Bagley and Woodburn drafted the December 27th press release and directed its dissemination to the investing public through PR Newswire, a service that distributes company news to the investing public.

21.     The December 27th press release falsely claimed that Trans Energy's involuntary bankruptcy arose from a "breakdown in communications." In the first quarter of 2000, Trans Energy consented to entry of a $600,665.36 judgment against it. Trans Energy's inability and failure to pay the $600,665.36 consent judgment formed the basis of its Chapter 7 bankruptcy.

22.     In the December 27th press release, Trans Energy falsely claimed that the bankruptcy filing came as "surprise." Bagley and Woodburn had known about Trans Energy's involuntary bankruptcy since October 2000.

23.     Additionally, the December 27th press release failed to disclose that on December 12, 2000, the bankruptcy court appointed a trustee, who held broad powers to supervise Trans Energy's operations.

24.     Trans Energy's claim in the December 27th press release that it was attempting to "settle" the bankruptcy was misleading. Trans Energy's attempts to "settle" the bankruptcy were not attempts to contest or negotiate the amount of Trans Energy's indebtedness, but were merely efforts to arrange an extended payment plan with the $600,665.36 judgment creditor.

25.     Bagley and Woodburn knew, or were reckless in not knowing, that the December 27th press release was false and misleading. Bagley and Woodburn knew that Trans Energy's involuntary bankruptcy was based on its continued failure to pay the $600,665.36 consent judgment. As the two individuals who controlled Trans Energy's operations, Bagley and Woodburn knew that the bankruptcy had been pending since October, that a trustee had been appointed, and that Trans Energy was not contesting the debt.

7.

**D.      Trans Energy's Commission Filings Misrepresented and Omitted Material Information About Litigation Pending Against It**

26.      As a public company with stock quoted on the OTC Bulletin Board, Trans Energy is required to file periodic and annual reports with the Commission related to, among other things, its financial condition and operations. In its Forms 10-QSB filed with the Commission for the first three quarters of 2000, Trans Energy described a legal proceeding involving the company as one in which the plaintiff sought "to recover monetary damages of $435,714, plus attorney's fees, exemplary damages, costs of the suit and interest" and in which "[t]he Company is presently attempting to negotiate a settlement." In the first quarter of 2000, however, Trans Energy consented to entry of a $600,665.36 judgment against it in that case, which the court entered in April 2000.

27.      Similarly, a Trans Energy noteholder sued Trans Energy and Bagley individually in 1998 for their failure to pay a $275,000 promissory note. In 1999, Trans Energy settled that case for $375,000. Until Trans Energy filed its Form 10-KSB for 2000, it did not disclose the filing of this lawsuit or its settlement. In its Form 10-KSB for 2000, Trans Energy acknowledged the lawsuit by disclosing the entry of a $428,018.11 judgment in favor of the noteholder. Trans Energy consented to entry of this judgment.

28.      Bagley and Woodburn knew, or were reckless in not knowing, that Trans Energy had not properly disclosed the above-referenced lawsuits in its Commission filings. Bagley and Woodburn reviewed each of Trans Energy's Forms 10-QSB and 10-KSB for accuracy before signing and filing them with the Commission. At the time these reports were filed with the Commission, Bagley and Woodburn were aware of the actual status of the two pieces of litigation. In the first quarter of 2000, Bagley signed the court papers agreeing to entry of the $600,665.36 judgment. In the noteholder litigation, Bagley was a defendant in his personal capacity, and he

8

signed the settlement agreement in that case in April 1999. Bagley regularly reported the status of litigation to Woodburn.

## COUNT ONE

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]

29.     Paragraphs 1 through 28 above are realleged an incorporated herein by reference.

30.     By their conduct, Trans Energy, Bagley, and Woodburn, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly and indirectly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operated as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

31.     By reason of the foregoing, Trans Energy, and Bagley and Woodburn violated Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT TWO

### Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] And Rules 12b-20, 13a-1, and 13a-13 Thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]

32.     Paragraphs 1 through 28 above are realleged an incorporated herein by reference.

33.     By its conduct, Trans Energy filed quarterly and annual reports with the Commission that misrepresented and omitted material information about litigation pending against the company.

9

34. Bagley and Woodburn knowingly and substantially participated in Trans Energy's filing of quarterly and annual reports that misrepresented and omitted material information about litigation pending against Trans Energy.

35. By reason of the foregoing, Trans Energy violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-13, 240.13a-13]. Further, Bagley and Woodburn aided and abetted Trans Energy's violations within the meaning Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

I.

Find that Trans Energy, Bagley, and Woodburn committed the violations alleged above.

II.

Enter a Final Order and Judgment of Permanent Injunction and Other Relief ("Final Judgment"):

A. Permanently restraining and enjoining Trans Energy, Bagley, and Woodburn, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B. Permanently restraining and enjoining Trans Energy, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who

receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, Section of 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

C.    Permanently restraining and enjoining Bagley and Woodburn, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, or aiding and abetting the violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

D.    Ordering Bagley and Woodburn to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act.

E.    Granting such other and additional relief as this Court may deem just and proper.

Respectfully submitted,

Carolann Gemski (D.C. Bar #438561)
Attorney for Plaintiff
United States Securities and Exchange Commission
500 W. Madison Street, Suite 1400
Chicago, IL  60661
(312) 353-0512